IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:09cr510(LMB) |
| | ) | |
| SCOTT CHRISTOPHER HOWE, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

In his Motion to Suppress [34] and the Supplemental Motion to Suppress [51] the defendant raises numerous arguments to support his claim that all statements taken from him on August 11-12, 2009, and the physical evidence seized from his residence should be suppressed. For the reasons stated in open court at the conclusion of the evidentiary hearing, and this memorandum opinion, the motion will be denied in all respects.

I. Factual Background

Sean Healy, a corporal with the Fauquier County Sheriff's Office, testified that around 3:30 p.m. on August 11, 2009, he was dispatched to a residence in Bealeton, Virginia to investigate a complaint involving marijuana. When he arrived, he was met in the residence's driveway by Mr. and Mrs. Cottrell, who identified themselves as the owners and landlords of the property. They told him that while doing maintenance work on the pool, they saw on the back deck plants that appeared to be marijuana plants. Officer Healy, who was the only officer on the scene, went with the Cottrells onto the property and walked to the backyard of the house where he saw the suspect plants on the back deck. Based on his experience with drug investigations,

including two years of undercover work, he identified the plants as marijuana.

The Cottrells advised Healy that Scott Howe, a teacher who worked at the same school where Mrs. Cottrell taught, had recently rented the house, was the sole tenant, and had resided there for a week. They also said they had been trying to call Mr. Howe, but had not been able to reach him. The Cottrells wanted Healy to search the residence but he declined to do so without the tenant's consent or a search warrant. Healy tried to telephone Howe. After Howe could not be reached, Healy called the Sheriff's Office and asked Detective Romero to start working on a search warrant for the residence. At 5:00 p.m., Deputy Steve Lewis, a Fauquier County K-9 officer, arrived in his patrol car with his dog (who apparently spent most of the time in the patrol car). When he arrived, Lewis saw Healy speaking with the Cottrells in the front yard. A few minutes later Howe arrived in his car, followed by a second car driven by a woman later identified as Cathy Smith, another teacher who taught in the same school as Howe. Howe pulled into the driveway, Smith parked her car on the street.

The only two officers on the scene when Howe arrived were Healy and Lewis, both of whom were in uniform. Healy met Howe in the driveway and told him he had received a complaint about marijuana on the property. Howe seemed surprised but remained polite. According to Cathy Smith, who was the only witness called by the defense, Howe was pale and nervous. She approached

him and told him to go up to the porch and sit down, which he did. At that point the officers asked her to leave the porch area. She complied and stayed in her car for an hour to observe the scene. She testified that she heard none of the conversations that followed.

Healy told Howe that from his experience, when marijuana plants are found on the premises, drugs are usually found other places on the property. Healy asked Howe if he would consent to a search of the residence and he agreed. Government Exhibit 1 is the written consent form which Howe signed at 5:15 p.m. In that form he acknowledged that no force or threats had been made and that his consent was voluntary. The form gave police authority to search the residence, Howe's vehicle, and all containers found. Howe was sitting on his front porch when he signed the consent form.

After the consent form was signed, Howe was patted down, and he, along with Healy and Lewis, entered the house.[1] Although the officers had invited Howe to sit on a chair, he chose to sit on the living room floor near the front door. When asked by the officers whether there was other contraband in the residence, Howe told them they would find a small bag of seeds and drug paraphernalia. He also said he had a handgun in the bedroom.[2]

---

[1] Given Howe's consent to the search, Healy notified Romero that a search warrant would not be needed. Romero testified that he went home as a result of not being needed for the warrant.

[2] Howe provided locations for all these items, which were found just where he said they were. This fact supports the

3

The search began in Howe's bedroom. Both Healy and Lewis testified that when they were in the master bedroom, they could not see Howe, who remained sitting by the front door. In that bedroom Healy saw a laptop on the floor, a video camera, a large tube of K-Y jelly, and underwear. These items struck him as suspicious. He directed Lewis to ask Howe about them. Lewis walked out of the bedroom back into the living room and asked Howe, who was still sitting by the front door, if there was anything illegal on the video/computer equipment. Howe responded that there was adult pornography and said that he was gay and that there were photos of him with his 15 year old boyfriend stored in the video equipment. He went on to describe a video as showing the boy masturbating and Howe touching him. Lewis described Howe's demeanor as calm when this discussion occurred and said he had not threatened Howe. Lewis estimated that this conversation occurred around 5:22 p.m. Howe had not received his Miranda rights at that time, however, neither Healy nor Lewis had placed Howe under arrest. He had not been handcuffed or physically restrained, and after he made the admission to Lewis, Lewis asked no further questions, returned to the master bedroom to report Howe's admissions to Healy and left Howe sitting by the front door. At this point, which was around 5:30 p.m., Healy called Detective Romero, who told Healy that he would prepare a search warrant for the video and computer equipment, and

---

Court's conclusion that Howe was not as distraught as defense counsel suggests.

4

instructed Healy to continue searching for drugs and not touch the computer or video equipment.[3]

At 6:12 p.m., Healy read Howe his Miranda rights from what he described as the standard Fauquier County Sheriff's Department form, but he also told Howe he was not under arrest. This first advisement of rights occurred in the kitchen. Howe was asked several times how he was feeling and told that an ambulance would be summonsed if he felt ill. Howe never asked for medical assistance.

Around 6:30 p.m., a third deputy, Deputy Hitt, arrived at the scene. Hitt's job was to watch Howe as Healy and Lewis continued to search the residence. Howe had free reign of the house. During the evening hours he chewed tobacco, got water, at one point discussed grilling some steaks, and discussed his prior surgery.

When Romero, along with two other deputies, arrived around 10:45 p.m. with the search warrant, Howe was sitting at the kitchen table. Romero brought a soda for Howe who was described as cooperative, nervous, and shaky. When Romero showed Howe the search warrant, Howe responded that he knew they were there for

---

[3] Romero testified that he lived about a 30 minute drive from the Fauquier County Sheriff's office. When he got the call, he was at home. By the time he left home, drove to the office, completed the paperwork and arranged for a magistrate (who also had to travel from home to the office) it was 9:15 p.m. The warrant was issued at 9:45 p.m. He arrived with the warrant at the Howe residence around 10:45 p.m. Two additional officers were on the scene to help with the search.

5

the videos. Around 12:20 a.m., when the search was finished, Romero placed Howe under arrest.

Romero drove Howe to the sheriff's office in his cruiser. At no time was Howe handcuffed or otherwise restrained. In fact, he sat in the front seat of the cruiser, next to Romero. They arrived at the Sheriff's office around 12:45 a.m. No magistrate was present.

Romero then read Howe his Miranda rights from a Fauquier County Sheriff's Department form and Howe executed a written waiver of his rights. Govt. Ex. 3. He was interviewed until 3:00 a.m. Then he was taken before a state magistrate. The entire interview was audiotaped and the Court has read the transcript and listened to the portion of the audiotape where Romero advised Howe of his rights and Howe agreed to waive his rights and speak with Romero.

II. Discussion

A. Entry Onto the Curtilage of Howe's Property

Howe's first argument, which is the subject of his Supplemental Motion to Suppress [51], is that Officer Healy's entrance onto Howe's backyard and deck, from which he viewed the marijuana plants, was an unconstitutional search of the curtilage under United States v. Van Dyke, 643 F.2d 992 (4th Cir. 1981), and that all evidence resulting from that violation of the curtilage must be suppressed as "fruit of the poisonous tree." In Van Dyke, officers walked through trees growing along the boundary between two rural properties, then climbed a fence to

get on the property from which they observed marijuana being unloaded from a vehicle. The Fourth Circuit held that this surveillance within the curtilage amounted to an unconstitutional trespass by the officers.

Although Officer Healy entered the curtilage of Howe's rented property to conduct surveillance, the fruits of that surveillance will not be suppressed because unlike the officers in Van Dyke, Officer Healy had an objectively reasonable basis to conclude that he had been invited onto the curtilage by people with authority to grant such access. As the evidence at the suppression hearing clearly established, Healy met the Cottrells at the edge of the property, where they identified themselves as the property owners and the leasors, and explained their limited purpose on the property that afternoon.[4]

A landlord's presence on rented property to make repairs is not an uncommon event. Howe appears to argue that Healy should have reviewed the lease or at least questioned the Cottrells more thoroughly as to whether Howe had authorized them to be on the property that day. He also references various portions of the

---

[4] Defense Exhibit 9 is a copy of the lease. It shows that the Cottrells had authority to enter the property at times for various reasons, such as to "maintain the Premises in good repair," (para. 14), and to provide any needed repairs to the "Hot Tub, Equip., & Cover," (para. 15) (chart). The lease also allowed the Cottrells to, "upon reasonable notification to the Tenant and at reasonable times, [] enter the Premises in order to . . . [m]ake necessary or agreed upon repairs [and to] . . . [s]upply necessary or agreed services." (para. 23). A special condition of the lease further permitted the Cottrells to "use a portion of the house to store their boxes/furniture[.]" (para. 41).

7

Virginia Code including Va. Code 55-248.18(A) that requires a landlord to give 24-hours' notice to the tenant for routine maintenance "that has not been requested by the tenant." Although there is no evidence in the record that Healy asked to see the lease or made further investigation into the authority of the Cottrells to admit him on to the property, it was objectively reasonable for Healy to believe the Cottrells had authority to invite him into the backyard. "As long as the facts available to the officer at the moment warrant a person of reasonable caution in the belief that the consenting party had authority, apparent authority to consent exists, and evidence seized or searched pursuant to that consent need not be suppressed." U.S. v. Buckner, 473 F.3d 551, 555 (4th Cir. 2007) (internal quotations omitted). For these reasons, the evidence obtained from Healy's viewing of the marijuana plants will not be suppressed.

B. The Consent Search

Howe next argues that his consent to search the residence was not voluntary because of his psychological makeup and recent medical problems. There was no evidence presented at the suppression hearing to support Howe's claim that his written consent to the search of his residence was unknowing or involuntary. Officers first contacted Howe outside his residence, in the presence of his friend, Cathy Smith. There was no display of force, Howe was not placed under arrest and there is no evidence of any intimidating conduct by the officers. In fact, it is significant that Cathy Smith, the only witness called

8

by the defense, who had been a nurse for many years and had taken care of Howe after his surgery, did not describe any intimidating conduct by the officers. She did describe Howe's recent surgery and his fragile health, but she did not testify that she felt he needed medical attention at the scene. It was she who suggested to Howe they walk to the porch and sit down. Although the officers asked her to leave the porch area, she said she returned to her car, where she remained for an hour observing, and neither heard nor saw any improper conduct by the officers. It is also significant that Howe, a college graduate, signed the consent form within 15 minutes of arriving at his home. Under the totality of these circumstances, the Court finds that the government has established by a preponderance of the evidence that Howe's consent to the search of his residence, vehicle, and any containers was knowing and voluntary. See e.g. United States v. Elie, 111 F.3d 1135, 1144 (4th Cir. 1997).[5] Therefore, the evidence obtained from the search of Howe's residence will not be suppressed.

  C. Howe's Admission About the Content of the Videos and Computers

Howe argues that his admission to Officer Lewis that the

---

[5] Defense counsel made a proffer that if called, Dr. Ratner, a forensic psychiatrist, would have testified about Howe's mental health issues and how they would have made him more vulnerable to feeling coerced by the police. In determining whether a person's consent was voluntary the Court examines the conduct of the police. In this case, there is no evidence of any coercive conduct by the sheriffs on the scene.

video and computer equipment contained pictures of his 15 year old boyfriend masturbating should be suppressed because these admissions were the fruits of a custodial questioning for which he had not received the warnings required by Miranda v. Arizona, 384 U.S. 436 (1966). Miranda warnings are required only when a person who is in police custody is questioned. Whether a person is "in custody" is determined by evaluating the totality of the circumstances at the time the statement is made to decide whether the person's "freedom of action is curtailed to a degree associated with formal arrest." Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (internal quotations omitted). Accord, United States v. Colonna, 511 F.3d 431,
435 (4th Cir. 2007).

The key facts supporting the government's argument that Howe was not in custody are first that he had not been told he was under arrest. Davis v. Allsbrook, 778 F.2d 168, 171-72 (4th Cir. 1985) ("though informing a suspect that he is not under arrest is one factor frequently considered to show lack of custody, it is not a talismanic factor"). Other key factors are that he was in his own home; only one officer, Lewis, was with him when he made the admission; and the admission occurred around 5:20 p.m., which was about five minutes after Howe and the two officers entered the house. Moreover, Howe had been sitting where he chose by the front door to the house, and had been outside the view of the officers. Given these facts and circumstances, the Court finds that Howe's freedom of movement had not been curtailed by the

officers and that a reasonable person would not have understood that he was under arrest at that time. Accordingly, Howe's admission about what was in the video and computer equipment will not be suppressed.

D. The Search Conducted Under the Warrant

The probable cause for the search warrant was primarily based on Howe's admissions, which were sufficient to support issuance of the warrant. Because those admissions will not be suppressed, the warrant will not be suppressed. Even if the warrant were defective the contents of the video and computer equipment would not be suppressed because the officers conducted the search in a good faith belief they were complying with the law. As the Supreme Court held in United States v. Leon, 468 U.S. 897, 926 (1984), evidence obtained from an invalidated search warrant will be suppressed "only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." There is no evidence in this record suggesting any dishonesty or recklessness by the officers.

E. Howe's Confession

It is undisputed that Howe was first confronted by law enforcement at 5:00 p.m., and not formally arrested by Sgt. Romero until 12:20 a.m. He was then read his Miranda rights, which he waived, at 12:45 a.m. Defendant argues that this extensive period of time in contact with law enforcement renders his confession involuntary.

Again the issue of voluntariness is determined by evaluating the totality of the circumstances. A confession is involuntary if the facts and circumstances establish that the person's will was either "overborne" or his "capacity for self-determination critically impaired[.]" Schnecklcth v. Bustamonte, 412 U.S. 218, 225 (1973). Moreover, in evaluating the involuntariness issue, the Court focuses on the actions of the police. Colorado v. Connelly, 479 U.S. 157, 165 (1986) (a mentally ill suspect "ordered by the voice of God" to confess was not coerced by the government); United States v. Cristobal, 293 F.3d 134, 140-41 (4th Cir. 2002) (confession held voluntary where defendant was on painkillers the morning after surgery, but appeared lucid).

Although Howe's confession occurred more than seven hours after he first encountered the police, on these facts the Court finds that the waiver of Miranda rights and the confession were knowing and voluntarily made. The best evidence supporting that conclusion are the audiotape and transcript of the waiver colloquy and confession. The tone of voice of Sgt. Romero and Howe reveal neither coercion by the police nor intimidation of the defendant.

Accordingly, for all these reasons, the defendant's Motion to Suppress and the Supplemental Motion to Suppress will be denied. An appropriate Order will issue.

Entered this 4th day of March, 2010.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge